James PUTMAN

v.

M/V MATHILDE BOLTEN, her boilers, engines, tackles, etc., and Partenreederei M.S., a body corporate, Defendants and Third-Party Plaintiffs,

v.

BALTIMORE STEVEDORING CO., Inc., Third-Party Defendant.

Civ. No. 18709.

United States District Court
D. Maryland.
April 3, 1969.

Jacob Hornstein and John J. O'Connor, Jr., Baltimore, Md., for plaintiff.

Manfred W. Leckszas, Baltimore, Md., for defendants and third-party plaintiffs.

David R. Owen, Baltimore, Md., for third-party defendant.

THOMSEN, Chief Judge.

In this 9(h) suit a longshoreman is suing the vessel on which he was working for injuries received when his leg went into a hole about 15″ x 30″ between the outer side of a hoistable deck and the shell plating, i. e., the side of the ship. The owner of the vessel has filed a third-party complaint for implied contractual indemnity against the stevedoring company.

### The Vessel

The M/V Mathilde Bolten, a West German flag vessel, was specially constructed in West Germany for the transport of Volkswagen automobiles to America on hoistable decks designed for that purpose, and for the transport of bulk or general cargo on the return voyage. She has four holds, in each of which there is a permanent 'tween deck;[1] in the No. 1 (the foremost) hold there are two hoistable decks under the 'tween deck; in the other holds there are three.

---

1. The No. 2 hold and No. 3 hold have two cargo hatches each.

The square of the hatch in the No.1 hold is very large compared to the size of the decks and runs forward to within an inch or two of the forward bulkhead. The side or wing sections of the hoistable decks in that hold taper toward—indeed to—the forward corners of the hatch. On the lower deck level there are five pontoon hatch covers, each 29' long (athwartship); four of them are about 9'5" wide and weigh about two tons each; the other pontoon is about 33½" wide.

In the fore part of the No. 1 hold the shell plating flares outward to some extent. Frames or ribs, in the nature of "I" beams run up the inside of the shell plating about 31" apart. Each of them projects inward about 12".

The distance between the wing sections of the deck and the shell frames is about 3". The distance between the wing sections of the deck and the shell plating between the frames is about 15". Except for the space between three sets of frames on each side, where a supporting beam projects beyond the side of the deck for a few inches, the hole between the side of the deck and the shell plating between the several frames is about 15" x 30".

Between the frames in the forward half of the No. 1 hold are ice-stringers or stiffeners, to strengthen the hull against floating ice. The stiffeners, which are welded to the shell plating and to the sides of the transverse frames, extend down and inboard at an angle of 45°. The top of one row of stiffeners is about level with the lower hoistable deck. Such a stiffener does not reduce materially the size of the hole at the top, and did not prevent plaintiff's leg from going down into the hole beyond the bottom of the stiffener.

The hoistable decks are made of metal plates and grating which rest on steel beams 8" high. The lower hoistable deck is 6'1" below the upper, and 5'5" below the bottom of the steel beams supporting the upper deck.

The wing sections of those decks are hoisted by means of steel wires and secured against the 'tween deck. In the raised position, they are locked together by special hooks, which are operated by hand and fastened to the permanent 'tween deck. In the lowered position, they are supported by vertical steel links, two of which are located on each side, about 14' aft of the forward bulkhead, 2' outboard of the hatch square, and 3' inboard of the shell frames. This location is opposite the middle of the second pontoon counting from the forward end of the hatch.

The width of the deck at the after end of the second pontoon is 5'6½". The width of the deck at the forward end of the second pontoon is 3'5". The deck continues to narrow opposite the first pontoon until it reaches a ladder which runs just inside the steel plating immediately aft of the bulkhead. A sketch of the starboard side of the lower hoistable deck in the No. 1 hold is shown.

M.V. "MATHILDE BOLTEN"
No.1 HOLD  LOWER HOISTABLE DECK
SCALE 1"=10'

## The Accident and the Injury

On the night of December 17–18, 1966, plaintiff was working on the lower hoistable deck in the No. 1 hold. He and the seven other men assigned to the hold had assisted in unloading all the automobiles from that deck. After one or two of the pontoon hatch covers had been lifted to the weather deck, plaintiff and three other longshoremen in the hold attached steel wire bridles to eyes at the four corners of the second pontoon aft of the forward bulkhead. They also fastened short guidelines at each corner of the pontoon, so that the longshoremen holding the guidelines could try to prevent the pontoon from swinging too far sideways—they sometimes swing as far as the skin of the ship—while being lifted. Plaintiff was holding the line attached to the forward starboard end of the pontoon and was standing on the wing section of the deck between the open hatch and the hole at the edge of the deck. The deck at that point was about 4' wide, and when plaintiff stood erect his head was between steel beams which came down from the upper deck to within 5'5" of the deck on which plaintiff was standing.

The pontoon started to swing toward plaintiff, and he was forced to step back. He stepped into one of the holes between the edge of the deck and the steel plating, and his leg went so far down that he struck his crotch against the corner of the deck and sustained a typical straddle injury of his perineum and scrotum, which severed his urethra and some adjoining tissue behind the testicles. He pulled his leg out of the hold, and did not realize he had been seriously hurt for some 15 minutes, by which time the bleeding into the injured area began to cause severe pain. He passed blood when he attempted to urinate, and was taken in an ambulance to a hospital. After several examinations he was taken that morning to the operating room, where a subrapubic cystostomy was performed with a perineal urethrostomy and intubation of the urethra. Because of intravenous feeding and tubes, through which his urine was drawn from the bladder, his hands and feet were secured for a couple of weeks. On January 18, 1967, one month after the accident and the first operation, he had a second operation, a cystourethroscopy and closure of the perineal urethrostomy. In laymen's language his urethra was recreated, with considerable scar tissue below the urethra, but little or no damage to the tissue above it. There was no damage to the penis itself or to the testicles.

Plaintiff was unable to work for nearly four months, and was handicapped in his work for some months thereafter. The other elements of damage will be discussed below under that heading.

## Seaworthiness

The hoistable decks were designed according to the requirements of the Volkswagen Werke A.G. to carry the maximum practicable number of automobiles in the given space. The design and construction, completed in 1961, were in accordance with the highest class of Germanischer Lloyd, the equivalent of the American Bureau of Shipping. The last official examination made on behalf of the West German Government was in April 1966. At that time, the rules for the prevention of accidents issued by the See-Berufsgenossenschaft (acting on behalf of the German Ministry of Transport), which were in effect in 1961, were met. Those rules are based on the 1960 International Convention for Safety of Life at Sea (SOLAS). Certificates issued from time to time show that the examining agency found the vessel satisfactory.

Plaintiff sought to introduce into evidence Article 6 of the Protection against Accidents (Dockers) Convention (Revised), 1932, of the International Labor Conference.[2] That convention, adopted

2. "Article 6
　"(1) While the workers are on a ship for the purpose of the processes, every hatchway of a cargo hold accessible to the workers which exceeds 5 feet (1 m. 50) in depth from the level of the deck to

by an agency of the League of Nations, was not ratified by either the United States or Germany, and those provisions are not included in the Safety and Health Regulations for Longshoring issued by the U. S. Department of Labor.[3]

Plaintiff also suggested that the size of the holes might be reduced by hinged flaps or other means, or that some possible protection might be afforded by coaming along the edge c ⋅ a deck, or a line supported by removable stanchions or pad eyes welded to the edge of the frames. Defendant offered evidence tending to prove that most of the suggested remedies were not practicable or would cause greater likelihood of injury than the hazards presented by the holes. The evidence indicates that no other injury caused by such holes has ever been reported, and that the hoistable decks on this vessel were similar to those on more than 100 other vessels.

Compliance with the customs and practices of an industry does not prevent a finding of unseaworthiness, although it is evidence to be considered on the issue. Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347, 353 (4 Cir. 1968); Bryant v. Partenreederei-Ernest Russ, 330 F.2d 185, 189 (4 Cir. 1964); Nuzzo v. Rederi, A/S Wallenco, Stockholm, Sweden, 304 F.2d 506 (2 Cir. 1962); Pettengill v. S.S. Jakara, 206 F. Supp. 172 (D.Ore.1961).

The basic principle to be applied was stated in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960):

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service."

It is not necessary to decide in this case whether the basic construction of the hoistable decks, with 15″ x 30″ holes along the sides of most of the decks, rendered the vessel unseaworthy *semper et ubique*. Farther aft in the vessel the deck is sufficiently wide to make unlikely such an accident as we have here. In many parts of the vesssel neither seamen nor longshoremen have any occasion to go near the outer edge of the deck except to assist in raising or lowering the deck or to secure or release the outermost automobile. The question of seaworthiness must depend in each case upon such factors as the width of the deck at the point in question, the work being done at the time of the accident, the injured man's previous knowledge of the holes, the lighting and the condition of the deck.

In this case plaintiff was required to stand on a deck not more than 4 feet wide, tapering forward to a much narrower width. His duties required him to hold a short line attached to the forward starboard end of a 2-ton pontoon as it was being lifted, to help prevent it swinging into the opposite wing of the hoistable deck. This was the customary way in which longshoremen assisted in the lifting of the pontoons, as was well known to the owners and charterers of such vessels and to the experienced stevedoring company. Of course, the pontoon might swing toward plaintiff, requiring him to take evasive ac-

---

the bottom of the hold, and which is not protected to a clear height of 2 feet 6 inches (75 cm.) by the coamings, shall, when not in use for the passage of goods, coal or other material, either be securely fenced to a height of 3 feet (90 cm.) or be securely covered. National laws or regulations shall determine whether the requirements of this paragraph shall be enforced during meal times and other short interruptions of work.

"(2) Similar measures shall be taken when necessary to protect all other openings in a deck which might be dangerous to the workers."

3. Cf. §§ 1504.32b and 1504.35 of those Regulations.

tion.[4] Under these circumstances, the narrowness of the deck and the resulting proximity of the 15″ x 30″ hole to a longshoreman doing the work plaintiff was doing at the time of the accident rendered the vessel not reasonably fit for that intended use. The fact that plaintiff was aware of the existence of the holes, or that the light was adequate at the point where he was injured,[5] does not affect this conclusion.

■ Plaintiff cannot properly be charged with contributory negligence, either for doing his work in the customary manner or in failing to escape the hole.

### Indemnity

■ The manner in which the stevedoring company and its employees chose to raise the pontoons, although customary, brought the unseaworthiness of the vessel into play and amounted to a breach of the warranty of workmanlike service, for which the vessel may recover over. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., Inc., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed. 2d 732 (1964); Calmar Steamship Corp. v. Nacirema Operating Co., 266 F.2d 79 (4 Cir. 1959), cert. den., 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959); Cia Maritima del Nervion v. James J. Flanagan Shipping Corp., 308 F.2d 120 (5 Cir. 1962).

### Damages

■ Plaintiff's injury was undoubtedly quite painful for some months. It prevented him from working for about four months, and interfered with his work during the balance of the year 1967. Since then, however, the weight of the credible evidence is that the injury has not prevented plaintiff from doing the regular work of a longshoreman.[6]

The injury to the urethra was successfully repaired by a not unusual operation. The possible future shrinking of scar tissue around the urethra will require exploratory calibration from one to four times a year. A further operation is a possibility but not a probability.

The erectal tissue above the urethra was not damaged; but the scar tissue which replaced part of the erectal tissue under the urethra (behind the testicles) has caused a slight change in the angle of the penis when erected. Plaintiff's urologist, whose testimony the Court finds credible, stated that this difficulty will probably disappear in about a year. The injury prevented sexual intercourse for one year, and still may cause some inconvenience. The Court does not find credible the testimony of plaintiff's psychiatrist that the difficulty has had an "irreversible" effect on the relationship between plaintiff and his wife, which cannot be helped by counseling. According to their own testimony they had little social life in common. Plaintiff, who is 58, still gets his companionship from his male friends who gather at the gas station, and will no doubt resume fishing, his favorite outdoor activity before the accident, when the weather becomes propitious. The accident undoubtedly has affected plaintiff's image of himself, but the claimed effect has been exaggerated.

Lost wages amount to about $2,600, medical expenses to $2,374.25. Probable future medical expenses are not large, and no probable loss of future earnings, except for the day of the calibrations and perhaps a day or two thereafter, was

---

4. Any lateral movement which plaintiff chose to make in the split second allotted to him might have been impeded by the eight-inch steel "I" beams which supported the upper hoistable deck and which would have bracketed his head unless he was working in a stooped position.

5. Whatever may have been the quality of the lighting aft in the No. 1 hold.

6. He worked more hours and made more money in 1968 than he did in the year before he was hurt; he made more money during 1968 than his own witness who worked steadily in plaintiff's regular gang. Plaintiff also works in other gangs from time to time.

proved. The pain and suffering, the mental anguish, the natural apprehension about future treatments, the sexual difficulties and the damage to plaintiff's self-image have been considered. The Court awards damages in the amount of $27,500.