**UNITED STATES of America**

v.

**Jacobo FINKIELSTAIN, a/k/a "Jackie," and Salomon Kaplan, a/k/a "Salo," Defendants.**

**No. 89 Cr. 0009 (MBM).**

United States District Court, S.D. New York.

Aug. 3, 1989.

---

Robert J. Cleary and Elliot R. Peters, Asst. U.S. Attys., and Benito Romano, U.S. Atty., S.D.N.Y., New York City, for U.S.

T. Barry Kingham and Daniel R. Lenihan, Curtis, Mallet–Prevost, Colt & Mosle, New York City, for defendant Jacobo Finkielstain.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendant Jacobo Finkielstain has moved to bar the government from presenting at trial the depositions of Luis Lecueder and Andreas Blauer, taken and videotaped pursuant to Fed.R.Crim.P. 15. He claims that both witnesses testified based on documents that were not available to him, thereby denying him confrontation rights guaranteed by the Sixth Amendment and discovery rights guaranteed by rule and statute, and violating evidentiary rules. For the reasons set forth below, the motions are granted in part and denied in part.

To the extent relevant to these motions, the indictment in this case charges a complex scheme whereby Finkielstain, as owner of the Central National Bank of New York ("CNB"), and his alleged co-conspirators, would enter into repurchase agreements, called "repos," without the authorization of the account holders in whose names these transactions were entered into, and then funnel the proceeds of the transactions to Swiss and Panamanian accounts, and thence to entities controlled by Finkielstain. In addition, the indictment charges that Finkielstain and others induced CNB to extend credit to several corporations without disclosing Finkielstain's interest in them. Among them were three companies called Lismore, Ballarat and Grafton.

## I. *The Lecueder Testimony*

Lecueder is a public accountant in Montevideo, Uruguay who testified that he had created the three shell corporations referred to above pursuant to Uruguayan law, and that after meeting Finkielstain in December 1984, he sold those corporations to that defendant. (Lecueder Tr. 13–15)

Lecueder testified that he then continued to do accounting work for those three entities. (Lecueder Tr. 16) Notwithstanding that the letterhead of the three companies used Lecueder's office address as their own, Lecueder testified that none of the three in fact was headquartered in his office and that he addressed requests for information and bills to an office Finkielstain maintained in Buenos Aires. (Lecueder Tr. 16–17, 23–26)

Lecueder was interviewed in Montevideo by the government in July 1988. According to a memorandum of that interview, he related the facts set forth above. (Peters Aff. Exh. A) He declined, however, to provide to the government documents of the three corporations (Peters Aff. ¶ 4), apparently on advice of counsel (Lecueder Tr. 44–46), and subsequently confirmed at his deposition that he would not turn those documents over to the government but would turn them over to someone he thought was authorized to receive them. (Lecueder Tr. 11–12, 31–32) Although Lecueder said initially that he was uncertain in view of the controversy surrounding these corporations whether he would turn the documents over to Finkielstain (Lecueder Tr. 12), he later testified as follows: "If Dr. Kingham [counsel for Finkielstain] assumes representation of Mr. Finkielstain and authorizes me to turn over those documents, I am willing to provide them forthwith." (Lecueder Tr. 32) The fencing between the government and Finkielstain culminated in an exchange that warrants substantial quotation:

> MR. PETERS: ... Mr. Kingham, I believe the witness indicated he would be willing to provide documents if you as a representative of Mr. Finkielstain would ask him for those documents. Are you willing to make that request?
>
> MR. KINGHAM: My understanding is that Mr. Finkielstain is not an owner or a director of any of these corporations and so I'm telling you, Mr. Peters, it was very cute, but my response is that I do not have authority from an owner or a director of the corporations to make that request.

When asked again by government counsel to make the request, with the suggestion that the witness would comply simply on the basis that the request came from Finkielstain, defense counsel addressed Lecueder as follows:

> MR. KINGHAM: Mr. Lecueder, let me explain something to you, please. I am not authorized by any owner or director of Lismore, Ballarat, Grafton or any other corporation to request of you the production of documents. The request that I make for the production of documents was made pursuant to Federal Rule of Criminal Procedure 15(c), which is a law with which you are obviously not familiar.
>
> THE WITNESS: I do not know.

Defense counsel then summarized the witness' position as he understood it, suggesting that the witness was willing to turn over documents only to an owner or a representative of the owners of the corporations, and was willing to give the documents to Finkielstain only because the witness believed Finkielstain to be such. Lecueder repeatedly tried to interrupt defense counsel's rendition of Lecueder's own views, but defense counsel insisted that inasmuch as no question was pending, it would be improper for the witness to speak. Eventually, the following exchange took place:

> THE WITNESS: Mr. Finkielstain may be the owner and, personally, with the relationship that I had with him, I would provide information to you if you are Mr. Finkielstain's representative because I have the conviction—I presume that you are.
>
> MR. KINGHAM: I am his representative, but I represent to you that I am advised as Mr. Finkielstain's representative that he is neither an owner nor a director of any of these companies. If you are prepared to provide documents to me given that understanding, I would be pleased to receive them.
>
> THE WITNESS: If you ask me for them on behalf of Mr. Finkielstain, I can give them to you.

MR. KINGHAM: I would be happy to receive them. The understanding is the documents will remain between us and the fact that you provide them to me is not to be used as any evidence to suggest in any way that Mr. Finkielstain is either an owner or director of these companies or that Mr. Finkielstain was an owner or director of these companies in 1985.

THE WITNESS: But those documents would be to prove what are the balance sheets of the above mentioned companies?

MR. KINGHAM: You heard what I said, sir. The documents I am requesting are all of the documents in your possession or the possession of your office that relate in any way to Mr. Finkielstain, Ballarat, Lismore, Grafton or any other company which you sold or furnished to Mr. Finkielstain.

THE WITNESS: And what are those documents good for?

MR. KINGHAM: Those documents, sir, have been requested in connection with this litigation. The judgment of how they are to be used, if at all, remains with me and perhaps with the judge if we seek to use them at trial.

THE WITNESS: Then I will think whether or not I should do that.

(Lecueder Tr. 62–64) Ultimately, the witness adhered to his original refusal to supply documents, for which he cited discretionary rules of professional confidentiality allegedly applicable in Uruguay. (Lecueder Tr. 46)

Although Lecueder originally was to have testified in Montevideo, his deposition was taken in New York when he came to the United States in April on personal business, but he has said he remains unwilling to return to this country to testify at trial. Before the venue of Lecueder's Rule 15 deposition was changed from Montevideo to New York, he apparently compiled a summary or list of entries in his diary and travel records in order to refresh his recollection as to the dates of meetings, those in attendance and, to a limited extent, the content of meetings. There were four such entries. (DX DD—Kingham Aff. Exh. C) Lecueder brought a copy of this one-page summary with him to New York, and consulted it before although not during his testimony. (Lecueder Tr. 46–50).

Finkielstain's motion centers on the corporate documents Lecueder did not produce and on the diaries and other records underlying the memorandum he prepared to refresh his recollection. In particular, Finkielstain argues that the "real" witness against him was not so much Lecueder as the documents he did not produce—the corporate records of Lismore, Ballarat and Grafton, and the diaries and travel records. Accordingly, Finkielstain reasons, that nonproduction violated his confrontation right under the Sixth Amendment. Further, he argues that failure to produce the documents renders Lecueder's testimony inadmissible under Fed.R.Evid. 612, which provides in pertinent part as follows:

[I]f a witness uses a writing to refresh memory for the purpose of testifying either—

(1) while testifying, or

(2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.... If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

Finally, Finkielstain contends that Lecueder was testifying to the content of documents not produced and accordingly that his testimony violates the best evidence rule as embodied in Fed.R.Evid. 1002.[1]

---

1. That Rule provides as follows: "To prove the content of a writing, recording, or photograph, the original writing, recording or photograph is

█ Finkielstain's confrontation argument is deficient both factually and legally. There are three essential points made by Lecueder's testimony: (i) that he sold the three shell corporations to Finkielstain, (ii) that he billed Finkielstain and not anyone else for his accounting services, and (iii) that the headquarters of the three corporations were not in Lecueder's office. All of those points were disclosed by Lecueder to government agents in July 1988, without examining any documents, based on Lecueder's own recollection of the events. This was not a situation in which a witness disclaimed any present recollection and could testify only that he had created at some time in the past a record that was accurate. Rather, at most the witness consulted documents before he testified for the purpose of strengthening—refreshing, in the time-worn evidentiary argot—a recollection that he brought to bear at the time he testified. Moreover, the record reflects that Lecueder's memory was strengthened only with reference to matters incidental and subsidiary to the three main points made by his testimony, as set forth above. Accordingly, Lecueder was the "real" witness.

Further, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (emphasis in original). The underlying right "is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination.... Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52–53, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987) (emphasis in original). *See also Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974) (" '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-exami-*

nation.' ") (quoting 5 J. Wigmore, Evidence § 1395 at 123 (3d ed. 1940) (emphasis in original)); *see generally Jones v. Berry*, 880 F.2d 670, 672–73 (2d Cir. 1989). There was no restriction on defense counsel's questioning of Lecueder of the sort forbidden by the Sixth Amendment.

Still further, as the lengthy quotation above makes clear by at least a preponderance of the evidence, Finkielstain had it within his power to secure the corporate records if only he had simply asked for them. Instead, when it became apparent that the witness was willing to produce the documents on demand ("THE WITNESS: If you ask me for them on behalf of Mr. Finkielstain, I can give them to you." ( [Lecueder Tr. 62] ), defense counsel chose instead to announce he would be happy to receive the documents (but not to ask for them) and to begin imposing upon the witness conditions as to conclusions to be drawn from the documents and otherwise to confuse the issue to such a degree that the witness ultimately decided he would prefer to reconsider whether he would produce them. Notably, counsel did not adopt the obvious expedient of asking for the documents without prejudice to maintaining that Finkielstain no longer had anything to do with the corporations—a position that had nothing to do with the witness giving or withholding his consent. In fact, I had informed both counsel that I would be available during this deposition to rule on disputed matters, if any. It would have been easy for counsel to have contacted me for a ruling that any request by Finkielstain for these documents could not be used at trial by the government as evidence of his ongoing involvement with the corporations. No such ruling was requested.

Rather, it is apparent to me from the transcript that defense counsel preferred having the issue to having the documents. Accordingly, to the extent one could discern a denial of the confrontation right in Lecueder's failure to produce corporate records, Finkielstain's failure to obtain the documents when he had the opportunity to

required, except as otherwise provided in these     rules or by Act of Congress."

do so was a waiver coextensive with that perceived denial. *Cf. United States v. Mastrangelo,* 693 F.2d 269, 272–73 (2d Cir. 1982) (government may use grand jury testimony when witness' silence at trial is procured by defendant). As to the diaries and travel records, the evidence reflects that the sheet Lecueder had in his possession contained all the relevant entries from such records, and Finkielstain's counsel had and used the opportunity to cross-examine with respect to those entries. Finkielstain offers only naked speculation to support the argument that the records contained other relevant entries.

■ Nor does Fed.R.Evid. 612 compel a different result. Under that Rule, Finkielstain would be absolutely entitled to any documents Lecueder examined to refresh his memory "while testifying," but there were no such documents. Thus, Finkielstain must rely on that portion of the Rule relating to documents consulted to refresh memory before testifying, for the purpose of testifying, which documents must be produced to the adverse party "if the court in its discretion determines it is necessary in the interests of justice." With respect to the corporate records, Lecueder's disclosure to government agents in July 1988 of the three main points contained in his testimony suggests he did not need or use those records to refresh his recollection as to the sale of Lismore, Ballarat and Grafton to Finkielstain, the subsequent billing to Finkielstain for accounting services, or the fact that the companies were not headquartered in his office. Accordingly, it does not appear he consulted such documents to refresh his memory for the purpose of testifying. Lecueder assuredly did consult the diaries and travel records for purposes of refreshing his memory in order to testify, but he produced at his deposition a sheet containing the relevant entries.

Moreover, to return for a moment to the corporate records, even if Lecueder had consulted them before testifying in order to refresh his memory, I could not find it to be "necessary in the interests of justice" for such records to be produced on pain of striking Lecueder's testimony. Although the rule offers no guidance as to what elements comprise "the interests of justice," that concept should include at a minimum some showing of probable materiality and clean hands. In this case, there is no evidence that those records would contradict Lecueder's testimony in any material respect, particularly with reference to the three main points covered in his testimony. Further, Finkielstain's own failure to secure production of the documents when he had the chance to do so must count against him when "the interests of justice" are being weighed.

■ Finkielstain's claims that he was denied the right to compulsory process under Fed.R.Crim.P. 15, and that Lecueder's testimony violated the best evidence rule, need not be discussed at length. Finkielstain had an opportunity to secure production of the corporate records, and he squandered it. Certainly there was no ongoing relationship between the government and Lecueder that would have required the government to secure documents from him. *Cf. United States v. Paternina–Vergara,* 749 F.2d 993, 996–98 (2d Cir.1984) (Jencks Act does not require the government to secure documents from foreign government absent joint investigation; even given such investigation obligation would be simply to make good faith effort), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). Moreover, there is nothing to indicate that Finkielstain was denied access to anything relevant in Lecueder's diaries and travel records which were, in any event, of only faint relevance to the main thrust of his testimony. In these circumstances, any denial of access to documents was either self-imposed or inconsequential; in neither event was Finkielstain deprived of rights guaranteed by Fed.R.Crim.P. 15. As to the best evidence rule, that canon requires the production of a document to prove its content when a witness testifies on the issue of what that document contains. It does not require production of a document simply because the document contains facts that are also testified to by a witness. *See* Advisory Committee Notes to Fed.R.Evid. 1002. Lecueder's testimony

fits into the second of these categories, not the first.

As to Lecueder's testimony, the only remedy I find appropriate—out of an excess of caution and not based on any finding that Fed.R.Crim.P. 16 has been violated—is to permit Finkielstain, if he chooses, to ask Lecueder in a straightforward and unqualified fashion to produce the corporate records of Ballarat, Grafton and Lismore, such request to be treated for all purposes at trial as if it were a statement as to which a suppression motion had been granted. That is to say, the government may not introduce the request as evidence on its direct case, nor may the government introduce the request at all unless Finkielstain testifies or presents evidence in such a fashion as would amount to a denial that the request had been made. Corporate records produced as a result of the request may be introduced as business records subject to any claim that they are incomplete, inaccurate or otherwise unreliable as to the matter they are offered to prove.

## II. *The Blauer Testimony*

█ Andreas Blauer testified in Montevideo, Uruguay in April, 1989 that he was, among other things, the representative of a foreign currency exchange firm called Turiel and had known Finkielstain for 20 or 25 years. (Blauer Tr. 17–18) Blauer and Turiel did foreign exchange business with Finkielstain and CNB from approximately 1984 through 1987. (Blauer Tr. 18) The pattern of the transactions was that Finkielstain, codefendant Salomon Kaplan or Ideal Zanelli, another CNB employee, would call Blauer to tell him that a sum of money was being deposited in a Turiel account at a bank or other financial institution. One of the three then would call Blauer and tell him where and how to disburse the funds. Blauer would note the instructions, and then give his notes to a Turiel employee who would maintain a running balance. This running balance then would be checked against the monthly statements from the financial institutions where the various Turiel accounts were maintained, and discarded every few months. In each case, according to Blauer,

he was the one who received the call from Finkielstain, Kaplan or Zanelli as to both incoming and outgoing CNB funds. (Blauer Tr. 21–27, 111)

The dispute over Blauer centers on the nature of his testimony in general, and in particular on his use of nine handwritten ledger sheets which he looked at occasionally as he testified. Blauer's testimony consisted mainly of identifying portions of the monthly statements at the financial institutions where Turiel maintained accounts, and then picking out which entries on those statements reflected CNB transactions. Although it is not clear from Blauer's testimony, the statements he examined at his deposition were not identical in form to the statements Turiel received. Rather, they included additional information and will be identified at trial, if necessary, by records custodians from each of the financial institutions as the copies of statements those institutions maintained in their own files.

Blauer identified the ledger sheets in question on direct examination as business records of Turiel, and it appeared from his testimony that they contained the running balance he had referred to in describing the pattern of Turiel's transactions with CNB. On cross-examination, however, it became apparent that the sheets were not themselves original records but rather a compilation of information derived from monthly statements Turiel had retained in its files and, perhaps, the running balance. The sheets were prepared by a Turiel employee at Blauer's instance following the government's request for documents reflecting Turiel's transactions with CNB and apparently in the mistaken belief that such a compilation would serve as an adequate response to such a request. (Blauer Tr. 108–110, 115) The government has conceded that these ledger sheets are not admissible in evidence.

Finkielstain attacks Blauer's testimony, as he did Lecueder's, as a denial of his Sixth Amendment right to confront the witnesses against him because the ledger sheets and bank statements, and not Blauer, were the "real" witness against

him, the ledger sheets being inadmissible to boot. He argues also that Blauer was simply reading documents for whose admissibility he could provide no foundation and, accordingly, his testimony violates the basic stricture of Fed.R.Evid. 602 that, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." In addition, Finkielstain objected repeatedly on hearsay grounds to Blauer's testimony about what the bank statements showed.

In order to analyze Finkielstain's objections, it is important to understand what Blauer was doing with the ledger sheets when he testified, those sheets having been compiled by a Turiel employee in response to Blauer's request to list the CNB transactions reflected in records Turiel maintained. As noted above, Blauer himself was party to all the CNB transactions, but he obviously could not recall each of them. The videotape shows that on occasion he consulted the ledger sheets to determine whether they contained an entry that corresponded to one on the bank records of the Turiel accounts that he was being asked to identify and from which he was being asked to select CNB transactions. It was apparently on the basis of such corresponding entries, when Blauer did consult the ledger sheets, that Blauer confirmed particular transactions as having been effected in behalf of CNB. There were transactions that Blauer was able to identify without consulting the ledger sheets, either on the basis of having recalled the amount (*e.g.*, Blauer Tr. 81–82) or because they involved Banque Contrade, an entity with which only CNB among his clients deal (*e.g.*, Blauer Tr. 38), or for some other reason. I have concluded from my examination of the videotape that Blauer consulted the ledger sheets in the fashion I have described with respect to only three bank statements—Government Exhibits 12–3B, 12–4A, and pages 1 and 2 of 14–7A. Moreover, with respect to page 1 of Exhibit 14–7A, at least one of the entries reflects a transaction involving Banque Contrade with which only CNB among Blauer's clients did business. However, with respect to the other entries on the enumerated exhibits, Blauer was apparently identifying transactions based on whether they matched entries on a document he had no hand in preparing, for whose accuracy he could not vouch, and which did not qualify as a business record. To describe it another way, Blauer's testimony included input from three sources: his own recollection, what bank records showed—such records to be identified at trial as business records of the entities that generated them, and, as to the exhibits enumerated above, what Blauer was told by another Turiel employee, via the ledger sheets, as to the content of Turiel records. The last source is simply hearsay, which is inadmissible unless it fits within one of the recognized exceptions to the hearsay rule. Fed.R.Evid. 802. Here, to the extent the testimony as to the enumerated exhibits is based on the ledger sheets, it does not come within any such exception. As the government concedes, the sheets themselves are not business records. Moreover, they do not appear to come within the catch-all exception to the hearsay rule, Fed.R.Evid. 803(24), because they do not appear to be "more probative on the point for which [they are] offered than any other evidence which the proponent can procure through reasonable efforts." Indeed, the government has already asked Blauer to produce the records from which the ledger sheets were compiled, and he has expressed willingness to do so. (Blauer Tr. 132)

Accordingly, Blauer's testimony with respect to the enumerated exhibits and portions thereof, except insofar as such testimony reflects transactions involving Banque Contrade, will be stricken. However, if Blauer produces the records from which the ledger sheets, Government Exhibit 55–3 A through I, were prepared, and if those records confirm the accuracy of the exhibit, the stricken testimony will be admitted.

\* \* \*

To recapitulate, Finkielstain may ask Lecueder for the corporate records of Lismore, Ballarat and Grafton without prejudice at trial, and may introduce such

records, both to the extent outlined above. Blauer's testimony with respect to Government Exhibits 12–3B, 12–14A and pages 1 and 2 of 14–7A, with the exception of testimony relating to a transaction involving Banque Contrade appearing on page 1 of Exhibit 14–7A, is stricken, subject to being received if the government can show that the entries on Government Exhibit 55–3A through I concerning the transactions in the stricken testimony reflect accurately the Turiel business records from which such entries were compiled. The motions otherwise are in all respects denied.

SO ORDERED.