**John W. McKEOWN, Plaintiff,**

v.

**WOODS HOLE, Martha's Vineyard and Nantucket Steamship Authority, Defendant.**

**No. Civ.A. 96–10989–MLW.**

United States District Court,
D. Massachusetts.

June 3, 1998.

David F. Anderson, Latti Associates, Boston, MA, for John W. McKeown, plaintiff.

Thomas E. Clinton, Craig R. Nickerson, Clinton & Muzyka, Boston, MA, for Woods Hole, Martha's Vineyard and Nantucket Steamship Authority, defendant.

***ORDER RE: PLAINTIFF'S MOTION FOR PARTIAL NEW TRIAL ON THE ISSUES OF: UNSEAWORTHINESS AND CONTRIBUTORY NEGLIGENCE (DOCKET ENTRY # 68); PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF CONTRIBUTORY NEGLIGENCE (DOCKET ENTRY # 66); DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW CONCERNING FUTURE PAIN AND SUFFERING (DOCKET ENTRY # 64)***

BOWLER, United States magistrate Judge.

On April 2, 1998, this court entered a final judgment in the above styled maritime action. Thereafter, plaintiff John W. McKeown ("McKeown") and defendant Woods Hole, Martha's Vineyard and Nantucket Steamship Authority ("Woods Hole") filed timely, renewed motions for judgment as a matter of law under Rule 50(b) ("Rule 50(b)"), Fed.

R.Civ.P. (Docket Entryè64 & 66). In addition, McKeown filed a motion for judgment as a matter of law under Rule 50(b) as well as, in the alternative, for a new trial under Rule 59(a) ("Rule 59"), Fed.R.Civ.P., on the issues of unseaworthiness and contributory negligence. (Docket Entry # 68).

## PROCEDURAL BACKGROUND

This case arises out of an injury suffered by McKeown on April 18, 1996. At the time, McKeown was employed by Woods Hole as a seaman and member of the crew aboard the M/V Martha's Vineyard, a vessel owned and operated by Woods Hole and in navigable waters at the time of the injury. (Docket Entry ## 1 & 5, ¶¶ 3–8; Docket Entry # 17, ¶ 2). On April 18, 1996, while in the course of his employment as a seaman aboard the M/V Martha's Vineyard, McKeown suffered personal injuries. (Docket Entry ## 1 & 5, ¶¶ 9).

McKeown's three count complaint alleges Jones Act negligence (Count I), unseaworthiness of the vessel (Count II) and maintenance and cure (Count III). McKeown chose not to pursue the maintenance and cure count at trial. Accordingly, this case was tried to the jury under counts I and II for Jones Act negligence and unseaworthiness.

After a seven day trial, the jury rendered a verdict in favor of McKeown on Count I under the Jones Act and in favor of Woods Hole on Count II under the doctrine of unseaworthiness. The jury also found that McKeown's negligence contributed to causing his injuries in the proportion of 20%. The jury assessed the following damages: $40,000 for past lost income, $100,000 for past pain and suffering, $60,000 for future lost earning capacity and $100,000 for future pain and suffering.

In seeking judgment as a matter of law, Woods Hole objects to the $100,000 award for future pain and suffering damages on the basis that McKeown failed to offer any expert testimony that he will experience pain and suffering in the future as a result of the negligence of Woods Hole. Woods Hole also points to McKeown's failure to offer the jury any evidence of his life expectancy. (Docket Entry ## 64 & 65).

McKeown contends that Woods Hole failed to offer sufficient evidence to support the jury's finding of contributory negligence. (Docket Entryè66 & 67). In addition, McKeown seeks a new trial or judgment as a matter of law on the issue of contributory negligence and unseaworthiness due to two allegedly prejudicial errors in the admission and the exclusion of evidence. (Docket Entry ## 68 & 69).

This court initially turns to McKeown's motions and thereafter addresses Woods Hole's motion.

## I. PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF CONTRIBUTORY NEGLIGENCE (DOCKET ENTRY # 66)

McKeown moves for judgment as a matter of law on the issue of contributory negligence under Rule 50(b). McKeown requests that this court set aside the jury finding of contributory negligence due to insufficient evidence that he was negligent and that such negligence contributed to his injuries. On March 31, 1998, after considering the evidence, this court denied McKeown's initial Rule 50(a) motion for judgment as a matter of law on the issue of contributory negligence. After further consideration, this court affirms its initial decision.

"A jury verdict may not be set aside as a matter of law under Fed.R.Civ.P. 50(b) except on a 'determination that the evidence could lead a reasonable person to *only one conclusion.*'" *Acevedo–Diaz v. Aponte,* 1 F.3d 62, 66 (1st Cir.1993) (quoting *Hiraldo–Cancel v. Aponte,* 925 F.2d 10, 12 n. 2 (1st Cir.), *cert. denied,* 502 U.S. 1004, 112 S.Ct. 637, 116 L.Ed.2d 655 (1991), emphasis in original). In other words, McKeown is entitled to judgment as a matter of law only if a reasonable jury could not have reached the finding of contributory negligence. *See Star Financial Services, Inc. v. Aastar Mortgage Corporation,* 89 F.3d 5, 8 (1st Cir.1996); *accord Andrade v. Jamestown Housing Authority,* 82 F.3d 1179, 1186 (1st Cir.1996) (proper to allow motion where evidence " 'would not permit a reasonable jury to find

in favor of the plaintiff on any permissible claim or theory' "). Insufficient evidence provides a proper basis to enter judgment as a matter of law. *See United States v. Articles of Drug: 5,906 Boxes,* 745 F.2d 105, 113 (1st Cir.1984). Evidence and inferences reasonably extracted therefrom are viewed in the light most favorable to Woods Hole, the nonmovant. *Golden Rule Insurance Company v. Atallah,* 45 F.3d 512, 516 (1st Cir.1995); *Sanchez v. Puerto Rico Oil Company,* 37 F.3d 712, 716 (1st Cir.1994). Furthermore, it is improper to resolve conflicts in the testimony or to evaluate the credibility of the witnesses when ruling on a Rule 50(b) motion. *Star Financial Services, Inc. v. Aastar Mortgage Corporation,* 89 F.3d at 8.

 Viewed under this restrictive standard, it is apparent that more than enough evidence existed for the jury to find that McKeown's actions contributed to causing the injuries he experienced when he fell from the ladder while greasing the bearings of the cargo doors on the vessel on April 18, 1996.[1] Prior to April 1996, McKeown testified that he had used an extension ladder two or three times to change light bulbs "or something" while the vessel was at the pier. On the day of the accident, McKeown testified that he enlisted the assistance of another crewmember, Martin Manley ("Manley"), the wiper, to perform the task of greasing the cargo doors. McKeown also stated that he had more experience than Manley and was in charge of the job. Prior to the day of the accident, McKeown had worked with Manley on only one occasion for a couple of days.

McKeown testified that he and Manley retrieved the extension ladder from the bulkhead of the vessels' freight deck. McKeown testified that he was aware of the proper way to hold an extension ladder while another man is working on the ladder. On cross examination, McKeown again explained a proper way to spot or hold the ladder. Nev-

ertheless, McKeown testified that he did not instruct Manley how to secure the ladder nor did he ask Manley if he knew anything about ladders. In fact, McKeown testified that, prior to ascending the ladder, he did not have any discussion with Manley to insure that Manley knew what he was doing.

After greasing one set of doors, McKeown and Manley proceeded to grease the next set of doors. Believing it was safe to climb the ladder, McKeown made his ascent with a grease gun and rag and proceeded to grease the bearings. Manley testified that when McKeown began to make his descent that he said to McKeown, "All set John." Manley then bent over to pick up a rag. It is significant that when he looked up, however, McKeown was going up the ladder to the next rung. At that point, the bottom of the ladder "kicked out" and McKeown fell down, according to Manley. Irrespective of his decision to perform the task at sea, McKeown's conduct in the course of performing the task is sufficient for a reasonable jury to find against him on the contributory negligence claim. McKeown's motion (Docket Entry # 66) is therefore without merit.

II. *PLAINTIFF'S MOTION FOR PARTIAL NEW TRIAL ON THE ISSUES OF: UNSEAWORTHINESS AND CONTRIBUTORY NEGLIGENCE (DOCKET ENTRY # 68)*

McKeown moves for judgment as a matter of law under Rule 50 and for a new trial under Rule 59(a) with respect to the issues of contributory negligence and unseaworthiness. As noted above, the jury found in favor of Woods Hole on the unseaworthiness issue and further determined that McKeown's negligence was 20%.

Although a different standard applies to assess a Rule 50 versus a Rule 59 motion, McKeown's twofold argument to support the

---

1. "[C]omparative negligence is in effect under ... the Jones Act" and serves to mitigate the damages found by the jury. *Carter v. Schooner Pilgrim, Inc.,* 238 F.2d 702, 705–706 (1st Cir. 1956). A vessel owner's liability is therefore "offset proportionately to the extent to which the jury determines the plaintiff's own negligence contributed to his injuries." *Hubbard v. Faros*

*Fisheries, Inc.,* 626 F.2d 196, 200 n. 1 (1st Cir. 1980).

The following summary highlights a portion of McKeown's conduct in the course of performing the task of greasing the cargo doors. The summary, however, does not recite all of the aspects of McKeown's conduct upon which the jury could find comparative negligence.

combined motion is the same. First, he claims that this court improperly excluded evidence of the use of a mechanical device to grease the cargo doors referred to as a genie boom or truck. Second, he argues that this court improperly admitted evidence in the form of oral testimony of the content of a document thereby violating Rule 1002, F.R.E, the codification of the best evidence rule.

As previously explained, under Rule 50 this court cannot override the jury's verdict on the issues of contributory negligence and/or unseaworthiness unless the evidence and reasonable inferences therefrom are " 'so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome.' " *Colasanto v. Life Insurance Company of North America*, 100 F.3d 203, 208 (1st Cir.1996) (citation omitted); *accord Transamerica Premier Insurance Company v. Ober*, 107 F.3d 925, 929 (1st Cir.1997).

In general, to reverse the jury's verdict and order a new trial on the issues of contributory negligence and/or unseaworthiness Rule 59(a) requires a finding that "the verdict is so seriously mistaken, so clearly against the law or evidence, as to constitute a miscarriage of justice." *Transamerica Premier Insurance Company v. Ober*, 107 F.3d at 929; *accord Colasanto v. Life Insurance Company of North America*, 100 F.3d at 212; *Sanchez v. Puerto Rico Oil Company*, 37 F.3d at 717. More specifically, evidentiary rulings in the admission or exclusion of evidence provide a basis for a new trial. *See Klein v. Hollings*, 992 F.2d 1285, 1289–1290 (3rd Cir.1993); *King v. Emerson Electric Company*, 837 F.Supp. 1096, 1098 (D.Kan. 1993) (court may allow new trial "when prejudicial error has entered the record"), *aff'd*, 69 F.3d 548 (10th Cir.1995); *Hall v. Norfolk Southern Railway Company*, 829 F.Supp. 1571, 1579 (N.D.Ga.1993) (court may allow "motion for new trial upon a showing of certain substantial errors in the admission of evidence"); *Alejo Jimenez v. Heyliger*, 792 F.Supp. 910, 914 (D.P.R.1992) (Rule 59 is broadly stated and grounds for relief include " 'questions of law arising out of substantial errors in the admission or rejection of evi-

dence' "). Errors in either the admission or the exclusion of evidence, however, are not "ground for a new trial unless the refusal to take such action appears to the court inconsistent with substantial justice." *United States v. Merritt–Meridian Construction Corporation*, 890 F.Supp. 1213, 1223 (S.D.N.Y.1995) (quoting Fed.R.Civ.P. 61; internal quotation marks and ellipses omitted), *aff'd in part and vacated in part on other grounds*, 95 F.3d 153 (2d Cir.1996).

McKeown first submits that this court incorrectly excluded evidence he offered that, prior to the April 18, 1996 injury, the vessels operated by Woods Hole used a mechanical device called a genie boom to grease the cargo doors. According to McKeown, this prior practice was relevant to the unseaworthiness issue of whether the M/V Martha's Vineyard maintained suitable and proper equipment on the day of the injury.

During the direct testimony of McKeown, counsel began asking McKeown questions about whether he worked on the M/V Martha's Vineyard more than two years prior to the April 1996 accident. Opposing counsel objected to this line of questioning. After questioning the relevance of the testimony, this court heard the matter at sidebar. At sidebar, McKeown's counsel explained that the evidence would be that when the vessel was first purchased, the task of greasing the cargo doors was performed by members of the maintenance department and that these crewmembers used a "genie boom." Counsel described a genie boom as a piece of equipment which, similar to a cherry picker, lifts and holds a man in a cage. Counsel then stated that he was offering such evidence to show the appropriate equipment required for the crew. When counsel was further queried as to how a genie boom constituted appropriate equipment, counsel stated that, in light of future testimony concerning use of the ladder, it was a reasonable conclusion that the genie boom was a safer method. Counsel further stated his belief that there might be evidence forthcoming from opposing counsel that the genie boom method was the safer method. This court then stated that it would

allow the testimony in rebuttal but not at this point in time.

McKeown presently argues that the evidence of Woods Hole's prior practice of using a genie boom was relevant and admissible on the issue of unseaworthiness. In particular, McKeown asserts that "had the jury heard evidence that prior to the [p]laintiff's accident that the [d]efendant had provided a 'genie boom' to grease the doors and that this piece of equipment was both available at the time of the accident and safer, they could have found that the vessel [sic] unseaworthy due to the lack of safe and proper equipment to perform the task." (Docket Entry # 69).

At sidebar, however, McKeown's counsel only indicated that the genie boom was used when the vessel was first purchased as opposed to at or around the time of the accident. Counsel's description of the time period corresponded with the line of questioning of McKeown inasmuch as he was asked whether he had worked on the M/V Martha's Vineyard more than two years prior to the injury.

 Not only was the evidence of the genie boom distant in time from the accident but the critical issue as to the unseaworthiness of the vessel was not the existence of safer alternatives. Rather, the issue was whether the equipment used or furnished, i.e., the ladder, was reasonably fit for its intended purpose on April 18, 1996. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960) (duty is to furnish "appurtenances reasonably fit for their intended use;" standard is to furnish "vessel reasonably suitable for her intended service"); Morton v. Berman Enterprises, Inc., 669 F.2d 89, 92 (2d Cir.1982) ("proper inquiry for the jury was not which hooks were safer, but whether the open hooks actually used were reasonably safe"); Marshall v. Ove Skou Rederi, 378 F.2d 193, 201 (5th Cir.) ("[w]hether shipowner should have used a better or safer appliance or gear is not the real question, but whether under all the circumstances the slings used were reasonably safe"), cert. denied, 389 U.S. 828, 88 S.Ct. 86, 19 L.Ed.2d 84 (1967). The duty of the shipowner is not to furnish an accident-free ship, Mitchell v. Trawler Racer, Inc., 362 U.S. at

550, 80 S.Ct. 926, but, instead, to furnish a ship, including gear and equipment, which is reasonably suited for its intended use, i.e., greasing the cargo doors. See Martinez v. Dixie Carriers, Inc., 529 F.2d 457, 467 (5th Cir.1976) ("[u]se of defective or inadequate equipment or gear not reasonably suited for the purposes for which it is used may render a vessel unseaworthy").

 Compliance with industry practice or custom in the trade may be considered by the jury and is relevant to the issue of unseaworthiness, see Bryant v. Partenreederei–Ernest Russ v. Oriole Ship Celling Company, 330 F.2d 185, 190 (4th Cir.1964); Putman v. M/V Mathilde Bolten, 298 F.Supp. 660, 665 (D.Md.1969), but it is not the standard. See Webb v. Dresser Industries, 536 F.2d 603, 607 (5th Cir.1976) ("determination of reasonable fitness is not limited by custom"), cert. denied, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); Burns v. Anchor–Wate Company, 469 F.2d 730, 734–735 (5th Cir.1972); Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347, 353 (4th Cir.1968). The proffered evidence also lacked sufficient foundation inasmuch as it failed to adequately demonstrate an established custom or practice in the industry.

Balancing the relevance of the prior practice against the danger of misleading the jury to focus on the safest or the best alternative equipment, this court deemed it more appropriate to exclude the evidence at that time, but to allow the evidence in during rebuttal. Permitting McKeown to testify on the use of a genie boom at a time when the vessel was first purchased would confuse the jury and also unfairly prejudice Woods Hole by focusing attention on the need to provide the best available equipment as opposed to equipment reasonably suited for its intended purpose. Exploring matters occurring more than two years prior to the accident would also result in undue delay. In the event Woods Hole allowed the evidence to enter through another witness, however, the unfair prejudice would be lessened and perhaps disappear. In the exercise of its discretion, therefore,

this court excluded the evidence at that time under Rule 403, F.R.E.[2]

■ McKeown next submits that this court incorrectly admitted testimony about the contents of a document in violation of Rule 1002, F.R.E. The document at issue, defendant's exhibit I, was marked for identification but not admitted into evidence at trial. With respect to the unseaworthiness issue, McKeown posits that the oral testimony concerning the contents of exhibit I is of importance because it provided the jury with the only evidence that the crew was properly trained to perform the task of greasing the cargo doors while the vessel was in port. With respect to the contributory negligence issue, McKeown reasons that the oral testimony about the contents of exhibit I was the only evidence that McKeown knew or should have known to grease the cargo doors while the vessel was in port and that the jury therefore based its finding of contributory negligence on the fact that he greased the cargo doors while the vessel was in transit. (Docket Entry # 69).

With respect to exhibit I, Chief Engineer John Griffith ("Griffith") testified that the exhibit was a list of weekly tasks for the crew to perform, including greasing the cargo doors. Griffith further stated that the list was posted on the window in the control room. It was visible, albeit not readable, in exhibit A, as a photograph of the control room which was admitted into evidence.[3] Significantly, Griffith did not read from exhibit I nor testify that the list stated that the task of greasing the cargo doors was to be performed at night. Rather, he merely stated that he thought it was better to grease the

cargo doors in port because of the difficulty involved if they were at sea and because he likes the oiler to be in the engine room when the vessel is underway.

The tenure of McKeown's argument is that this court improperly admitted the oral testimony about the contents of the list without admitting the document itself in violation of Rule 1002, F.R.E. McKeown represents that the contents of the list stated that the "doors where (sic) to be greased at night."[4] (Docket Entry # 69, p. 5). The oral testimony about the list, however, made no reference to the times in which to perform the task. Hence, McKeown's argument is based on an incorrect summary of the oral testimony and unavailing for this reason alone.

■ Furthermore, no evidentiary rule, including Rule 1002, F.R.E., "prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation." *R & R Associates v. Visual Scene, Inc.,* 726 F.2d 36, 38 (1st Cir.1984). Thus, neither the best evidence rule nor Rule 1002, F.R.E.,[5] " 'require production of a document simply because the document contains facts that are also testified to by a witness.' " *Allstate Insurance Company v. Swann,* 27 F.3d 1539, 1543 (11th Cir.1994) (quoting *United States v. Finkielstain,* 718 F.Supp. 1187, 1192 (S.D.N.Y.1989)). Rule 1002, F.R.E., therefore, does not prohibit Griffith's testimony. *See, e.g., United States v. Hernandez–Fundora,* 58 F.3d 802, 808–809 (2d Cir.), *cert. denied,* 515 U.S. 1127, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995); *Dalton v. Federal Deposit Insurance Corporation,* 987

---

**2.** In the unseaworthiness section of his argument, McKeown states, in passing, that, as a result of the exclusion of the genie boom "evidence, the jury's decision on the issue of contributory negligence was based on incomplete information." (Docket Entry # 69). McKeown does not elaborate upon this contention nor refer to it in the contributory negligence section of his argument. The exclusion, nevertheless, remains proper and was not inconsistent with substantial justice within the meaning of Rule 61, Fed. R.Civ.P.

**3.** McKeown identified the list on the window in exhibit A as comprising a list of jobs performed on a weekly basis. McKeown further noted that

one item was to grease the cargo doors on the Thursday watch. When asked whether the list also read that the doors were to be greased at night, McKeown replied, "Not to my knowledge."

**4.** Entitled "Things To Do [At] Night Weekly," exhibit I includes the task of greasing the doors.

**5.** Rule 1002, F.R.E. is generally considered "a conventional restatement of the so-called best evidence rule." *Allstate Insurance Company v. Swann,* 27 F.3d 1539, 1543 (11th Cir.1994) (internal quotation marks omitted).

F.2d 1216, 1223 (5th Cir.1993); *Doe v. United States,* 805 F.Supp. 1513, 1517 (D.Haw.1992).

In sum, neither of McKeown's arguments require entering judgment as a matter of law or ordering a new trial on the issues of contributory negligence and unseaworthiness.

### III. *DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW CONCERNING FUTURE PAIN AND SUFFERING (DOCKET ENTRY # 64)*

Woods Hole moves under Rule 50(b) for judgment as a matter of law on the portion of the jury's verdict pertaining to future pain and suffering. As noted above, the jury awarded McKeown $100,000 for future pain and suffering.

Woods Hole submits that McKeown "failed to offer any evidence that he will experience future pain and suffering as a result of the defendant's *negligence* [emphasis added]." (Docket Entry # 64). Elsewhere, Woods Hole elaborates upon this argument by claiming that McKeown "failed to introduce any evidence that any future pain and suffering is proximately related to the defendant's negligence." (Docket Entry # 65, p. 5). Secondly, Woods Hole contends that McKeown "failed to offer any evidence that any future pain and suffering proximately related to the defendant's negligence is reasonably probable or certain to occur." (Docket Entry # 64; Docket Entry # 65, p. 5). Woods Hole contends that expert medical testimony is required where, as here, McKeown's pain arises from a subjective injury. Finally, Woods Hole submits that McKeown failed to offer any evidence to establish the duration of his future pain and suffering and, in particular, failed to offer evidence of his life expectancy either through mortality tables, a request for judicial notice or expert testimony. (Docket Entry ## 64 & 65).

As an initial matter, the parameters of the first two arguments are not entirely clear. To support the arguments, Woods Hole cites to testimony of McKeown's expert that McKeown's osteoarthritis will not worsen "as a result of the *injury* " (Docket Entry # 65,

p. 2; emphasis added), as opposed to Woods Hole's negligence. The cases relied upon by Woods Hole primarily involve the necessary proof, including the necessity for medical testimony, to establish that the plaintiff suffered damages as a result of the accident for which there is liability. Thus, Woods Hole therefore raises an argument that McKeown failed to offer evidence that his future pain and suffering from the aggravation of his osteoarthritis was a result of the accident as well as an argument that McKeown failed to offer evidence to establish that he will experience future pain and suffering proximately related to Woods Hole's negligence. Additionally, Woods Hole contends that McKeown failed to offer evidence that the pain and suffering, i.e., the pain resulting from the alleged aggravation of the preexisting osteoarthritis, is reasonably probable to occur in the future. Although this court believes that Woods Hole intended to raise only the issues relating to proof of damages as opposed to liability, out of an abundance of caution and because Woods Hole repeatedly refers to its negligence, this court will address all three contentions.

 Also as a preliminary matter, throughout its supporting memorandum, Woods Holes relies primarily, albeit not exclusively, on cases involving the application of state law. The case at bar, however, involves the Jones Act with an injury to a seaman due to the negligence of his employer, Woods Hole. As explained below, medical causation under the Jones Act is not, necessarily, co-extensive with the prerequisites for medical causation under the common law of various states.

In addition to case law directly interpreting the Jones Act, the statute incorporates and "adopts 'the entire judicially developed doctrine of liability' under the Federal Employers' Liability Act ('FELA')," 45 U.S.C. § 51. *American Dredging Company v. Miller,* 510 U.S. 443, 455–456, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994); *see generally* Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* at 312 (2d ed.1994). FELA cases are therefore relevant in determining the quantum of proof necessary to show future pain

and suffering and to show a defendant's negligence causally related to such future pain and suffering.

"Interpretation of the Jones Act [also] relies upon the general principles of maritime law." *Mayhew v. Bell Steamship Company*, 917 F.2d 961, 962 (6th Cir.1990). Federal common law, however, "is to be developed, insofar as possible, to harmonize with the enactments of Congress," including the Jones Act. *American Dredging Company v. Miller*, 510 U.S. at 455, 114 S.Ct. 981.

In addition, admiralty jurisdiction unquestionably exists inasmuch as McKeown, a seaman, was injured in the course of his employment in the service of a ship. The injury occurred in navigable waters while McKeown, a seaman, was performing a shipboard task. *See generally* Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* at 78 & 93–94 (2d ed.1994). With admiralty jurisdiction necessarily "comes the application of substantive maritime law," *Preston v. Frantz*, 11 F.3d 357, 359 (2d Cir.1993), *cert. dismissed*, 512 U.S. 1279, 115 S.Ct. 31, 129 L.Ed.2d 928 (1994); *accord La Esperanza De P.R., Inc. v. Perez Y Cia. De Puerto Rico, Inc.*, 124 F.3d 10, 16 (1st Cir.1997) (admiralty jurisdiction brings maritime law along with it), including damage recovery rules. *Preston v. Frantz*, 11 F.3d at 359 ("damage recovery rules are substantive" for purposes of applying federal maritime law).

Equally true, however, is that admiralty plaintiffs are not restricted to maritime relief and may pursue "civil remedies provided by state law, so long as they do not conflict with the national substantive maritime law."[6] *Ellenwood v. Exxon Shipping Company*, 984 F.2d 1270, 1279 (1st Cir.), *cert. denied*, 508 U.S. 981, 113 S.Ct. 2987, 125 L.Ed.2d 682 (1993). " '[T]he extent to which the state law may be used to remedy maritime injuries is constrained by a so-called "reverse-*Erie*" doctrine which requires that the substantive remedies afforded by the

States conform to governing federal maritime standards.' " *Ballard Shipping Company v. Beach Shellfish*, 32 F.3d 623, 626 (1st Cir.1994) (citation omitted). Such preemption issues " 'ordinarily require[ ] a delicate accommodation of federal and state interests.' " *Ballard Shipping Company v. Beach Shellfish*, 32 F.3d at 628–629 (citation omitted).

With this framework in mind, this court turns to Woods Hole's arguments. As previously explained, Woods Hole asserts that McKeown failed to offer evidence to establish that he will experience future pain and suffering proximately related to Woods Hole's negligence. Proximate cause, however, is not the standard for causation under the Jones Act. Rather, Woods Hole is liable if McKeown proves by a preponderance of the evidence that Woods Hole's " 'negligence contributed even in the slightest to [McKeown's] injury.' " *Ferrara v. A & V. Fishing, Inc.*, 99 F.3d 449, 453 (1st Cir.1996) (quoting *Toucet v. Maritime Overseas Corporation*, 991 F.2d 5, 10 (1st Cir.1993)). Thus, under the Jones Act, a "plaintiff need not present medical evidence that the defendant's negligence was the proximate cause of the injury." *Mayhew v. Bell Steamship Company*, 917 F.2d at 963 (further noting that "medical expert must be able to articulate ... more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury").

The evidence, viewed in McKeown's favor, *Golden Rule Insurance Company v. Atallah*, 45 F.3d 512, 516 (1st Cir.1995), shows that Manley reached down to pick up a rag at a time when McKeown was on the ladder. The bottom of the ladder kicked-out, according to Manley, and McKeown fell and hit the deck. A reasonable jury could view Manley's conduct as negligent.

After the fall, McKeown was immediately transported to Falmouth Hospital when the ship reached Woods Hole. His injuries included a fractured acetabulum[7] and rib and

---

**6.** Moreover, the Fifth Circuit notes that, "[t]he analysis of a maritime tort is guided by general principles of negligence law." *Consolidated Aluminum Corporation v. C.F. Bean Corporation*, 833

F.2d 65, 67 (5th Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

**7.** Dr. Jean Jackson testified that the acetabulum is part of the pelvis bone and, in particular, the

McKeown recalls experiencing a significant amount of pain. McKeown stayed at the hospital for six to seven days and then at a rehabilitation center for approximately two weeks. In light of such evidence, a reasonable jury could find that the negligence of Woods Hole contributed to McKeown's injury within the meaning of the Jones Act.

The more problematic issues are whether McKeown met his burden of showing that he will experience pain and suffering in the future as a result of the accident and/or that the pain resulting from Woods Hole's negligence is reasonably certain to occur. According to McKeown's theory at trial, the accident aggravated a preexisting condition of osteoarthritis in his spine and the resulting pain is permanent.

At trial, McKeown testified that he experienced immediate pain on the deck after the fall. He remained in bed during his stay at Falmouth Hospital where he was placed in traction and received a morphine drip to alleviate the pain. When asked to describe his symptoms during that time, McKeown simply testified that he had a lot of pain. At the rehabilitation center, McKeown began using a walker and testified that he felt pain in the area of his groin, back and rib. After his treatment at the rehabilitation center, McKeown received physical therapy at his home in Falmouth. In June and July 1996, he stated that he was still experiencing a lot of pain in the area of his hip and groin. The symptoms did not improve by September 1996, according to McKeown's testimony.[8]

McKeown also testified that he continues to experience pain in the groin and hip area. He stated that he never had these pains prior to the April 18, 1996 accident. Other than normal twinges, McKeown testified that he had no pain in his back before the accident.[9] According to McKeown, walking for more than 15 or 20 minutes at the present time results in pain, as does climbing a long flight of stairs. He also stated that he does not presently engage in dancing.[10]

Believing that the pain in his hip was from arthritis, McKeown attempted to make an appointment with Dr. Jean Jackson ("Dr.Jackson"), who was not accepting new patients at that time. In the fall of 1996 McKeown testified that he still experienced pain in the area of his groin and hip. After seeing two other physicians in Boston in or around the fall of 1996, McKeown testified that he first saw Dr. Jackson in May of 1997.

Dr. Jackson, a board certified physician with a specialty in rheumatology, examined McKeown in May 1997. She testified that McKeown first presented himself as experiencing persistent right hip pain in the area around his groin and that he was not able to walk in the same manner as he had prior to the accident. She noted a limitation in the mobility of his back and a limitation in the internal rotation in both hip joints suggestive of mild osteoarthritis.

Dr. Jackson further testified that it was difficult to diagnose the source of referred pain such as that experienced by McKeown. She took a medical history, conducted a physical examination, reviewed x-rays and prescribed physical therapy and anti-inflammatory medication. In addition, she had a radiologist review McKeown's magnetic resonance imaging scans. As a result, she determined that McKeown "had osteoarthritis in his back that was rather dramatic" and "[n]ominal osteoarthritis" in his hip. Thus, in May 1997, she thought that the bulk of McKeown's pain originated from his back and was from the osteoarthritis.

McKeown saw Dr. Jackson for a follow-up appointment in August 1997 and again in December 1997. In August 1997 McKeown reiterated his persistent discomfort but noted some improvement. In December 1997 McKeown repeated his history of pain in the

cup portion which lodges the ball of the thigh or hip bone.

**8.** McKeown acknowledged that his rib had healed by August 1996.

**9.** McKeown additionally stated that 25 years or more prior to the accident he was treated for a muscle spasm. More recent medical records show that McKeown complained of occasional lower back pain.

**10.** McKeown stated that he began ballroom dancing in or around 1994.

right hip. Although Dr. Jackson noted improved movement in his back, she stated that McKeown had persistent discomfort in his lower back with bending. She continued his prescription for anti-inflammatory medication and testified that his "low back discomfort related to his osteoarthritis." She characterized McKeown's osteoarthritis in his back as his "primary problem." Elsewhere in her direct testimony, she stated that the acetabular fracture had healed well but that it was "very difficult" to differentiate whether the pain was "purely from his back" or "purely from his hip." Rather, according to Dr. Jackson, McKeown's pain had "components of both."

Dr. Jackson opined that McKeown's hip pain was:

> more likely referred pain and not just related to his hip. I think it's primarily related from his back, not total but primary.

She also stated her belief that it was more likely than not that McKeown's osteoarthritis predated the April 1996 accident. Based on a hypothetical question as well as her examination and treatment of McKeown, she opined that McKeown's fall and recovery from the fracture "more likely than not aggravated his condition of osteoarthritis in the lumbar spine." Elsewhere, she similarly testified as follows:

> Q. Do you have an opinion as to whether it's more likely than not that the fall from six to eight feet was sufficient force to fracture his acetabulum and his rib aggravating his preexisting osteoarthritis?
> A. Yes, I do.
> Q. What is that opinion?
> A. I feel that it did aggravate it completely.

In addition, she noted that McKeown's fracture of the acetabulum would make it difficult for a doctor treating him at the time to diagnose the back problem.

Significantly, she also testified that the condition arising from the aggravation of McKeown's osteoarthritis in his lumbar spine caused by the accident was permanent. In no uncertain terms, she stated that, "the condition is undoubtedly permanent because it's not going to resolve completely, purely because there are no disk spaces left and he has severe arthritis." She noted that McKeown could not return to heavy lifting of objects or repetitive motion. Based on a hypothetical question detailing the duties of an oiler such as McKeown, she testified that the aggravation of McKeown's osteoarthritis that was caused by the accident prevented him from returning to work in the occupation of an oiler and that, in all likelihood, "it is permanent." She also added that she did not know if his condition was "going to get worse as time goes on."

On cross examination, Woods Hole emphasizes that Dr. Jackson testified as follows:

> Q. Isn't it true, Doctor, that you cannot say that the osteoarthritis condition in his back will become worse as a result of the injury on April 18, 1996?
> A. True, I cannot say that.

Viewing the evidence and reasonable inferences in McKeown's favor, however, a reasonable jury could find that the force of the fall aggravated McKeown's preexisting osteoarthritis in his lumbar spine. A reasonable jury could also conclude that McKeown's pain symptoms arising from the aggravation of the preexisting osteoarthritis caused by the accident were permanent. Although these symptoms might not worsen over time, they would remain as a persistent and constant presence. A reasonable jury could additionally find that McKeown experienced pain symptoms immediately after the accident and that, although the hip and rib subsequently healed, he continued to experience the same pain symptoms thereafter. Alternatively, a reasonable jury could conclude that the osteoarthritis and the injuries from the accident combined to cause McKeown permanent pain in his right hip and groin area which was inseparable.

In *Sentilles v. Inter–Caribbean Shipping Corporation*, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), the Supreme Court addressed the sufficiency of the evidence before a Jones Act jury on whether an accident, for which there was liability, caused the aggravation of a previously latent condition. Similar to the case at bar, the evidence in *Sentilles* included medical testimony, in response to a

hypothetical question, that the aggravation of the preexisting latent condition "might be a consequence" of the accident. Medical testimony also existed that both the trauma from the accident and a diabetic condition were "the most likely causes" of the aggravation, but it was difficult to determine which cause was more likely responsible for the aggravation. Finally, another medical expert testified, in response to a hypothetical question, that the accident "probably" aggravated the plaintiff's condition but that "he would not say definitely." [11] *Sentilles v. Inter–Caribbean Shipping Corporation*, 361 U.S. at 109, 80 S.Ct. 173.

In upholding the jury's verdict in favor of the seaman, the Court stated the following:

> The jury's power to draw the inference that the aggravation of petitioner's tubular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs. The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all the circumstances, including the medical testimony into consideration.

*Sentilles v. Inter–Caribbean Shipping Corporation*, 361 U.S. at 109–110, 80 S.Ct. 173. In another Jones Act case, the First Circuit, quoting *Sentilles*, rejected a contention that the jury was improperly permitted to include future pain and suffering in their calculation of damages because the medical testimony only expressed the possibility of a causal relationship between the accident and the disability.[12] *Stafford v. Perini Corporation*, 475 F.2d 507, 511–512 (1st Cir.1973); *see also Cella v. United States*, 998 F.2d 418, 428–429 (7th Cir.1993) (Jones Act case wherein court found sufficient evidence of medical causation).

Dr. Jackson's testimony, as well as the testimony of McKeown as to his symptoms of pain, more than meets the necessary level of proof sufficient to establish a causal connection between the accident and the aggravation of McKeown's preexisting condition of osteoarthritis. Not only did Dr. Jackson testify that McKeown would experience a similar level of discomfort a year from the time of trial, but she also stated that the condition was permanent thereby justifying the jury's verdict of future pain and suffering. *See, e.g., Tolar v. Kinsman Marine Transit Company*, 618 F.2d 1193, 1197 (6th Cir.1980) (medical testimony of permanent disability sufficient to support award of future lost earnings in Jones Act case); *Firth v. United States*, 554 F.2d 990, 994 n. 7 (9th Cir.1977); *Rogers v. Elgin, Joliet & Eastern Railway Company*, 248 F.2d 710, 712 (7th Cir.1957) (medical testimony of permanent limitation of motion and the plaintiff's testimony of pain sufficient to support giving of jury instruction on future pain and suffering and future loss of earnings in FELA case); *Nettles v. Ensco Marine Company*, 980 F.Supp. 848, 851–854 (E.D.La.1997) (applying general maritime law and finding medical testimony of recurrent herniated disk caused by accident and permanent restrictions on bending and lifting sufficient to support award of future pain and suffering and future loss of earnings).

In addition, the jury was instructed on the effect of a preexisting condition and that, ordinarily, a defendant is only responsible for the additional increment of suffering caused by the defendant's negligence except where the injuries caused by the accident and the preexisting condition cannot be separated.

11. In contrast, Dr. Jackson's testimony is stronger than the medical testimony at issue in *Sentilles*.

12. When asked whether the plaintiff's symptoms were reasonable in view of the original injury,

the medical expert in *Stafford* simply testified that the plaintiff "could have a disability related to this." *Stafford v. Perini Corporation*, 475 F.2d at 511.

The instruction accurately reflected the law. *See Stevens v. Bangor and Aroostook Railroad Company,* 97 F.3d 594, 601–603 (1st Cir.1996) (FELA case); *Evans v. United Arab Shipping Company,* 790 F.Supp. 516, 519 (D.N.J.1992) (Jones Act case cited by First Circuit in *Stevens* ), *aff'd,* 4 F.3d 207 (3rd Cir.1993), *cert. denied,* 510 U.S. 1116, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994)). Based on Dr. Jackson's testimony concerning her inability to differentiate between the pain originating from McKeown's back versus the hip where he was injured, a reasonable jury could find the injuries caused by the accident and those caused by the preexisting osteoarthritis inseparable.

In short, based on the evidence viewed in McKeown's favor, a reasonable jury could find that McKeown will experience pain and suffering in the future as a result of the accident and, in particular, that the accident caused by Woods Hole's negligence resulted in the aggravation of his preexisting condition of osteoarthritis for which he will experience pain on a permanent basis in the future. A reasonable jury could also conclude that such pain is reasonably certain to occur in the future. Under the Jones Act, Woods Hole's aforementioned arguments are therefore unavailing.

Woods Hole's final argument concerns McKeown's alleged failure to establish the duration of his future pain and suffering. Woods Hole contends there was insufficient evidence to support the jury's verdict on future pain and suffering inasmuch as there was no evidence of McKeown's life expectancy. As previously noted, insufficient evidence to support the jury's verdict provides a basis for entering judgment as a matter of law under Rule 50(b). *See United States v. Articles of Drug: 5,906 Boxes,* 745 F.2d 105, 113 (1st Cir.1984) (after careful consideration "that the evidence was insufficient" trial court has power to enter judgment as a matter of law under Rule 50(b)), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1358, 84 L.Ed.2d 379 (1985); *see also Hammond v. T.J. Little & Company, Inc.,* 82 F.3d 1166, 1172 (1st Cir. 1996); *Velazquez v. Figueroa-Gomez,* 996 F.2d 425, 426–427 (1st Cir.), *cert. denied,* 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993).

The issue is one of first impression and, indeed, troubling to this court. In open court on March 31, 1998, this court similarly expressed its belief that the issue was problematic.

To support its argument, Woods Hole provides one citation, section 924 of *Restatement (Second) of Torts* (1979). Section 924 provides that a personal injury plaintiff is entitled to recover damages under clause (a) for "bodily harm and emotional distress" and under clause (b) for "loss or impairment of earning capacity." In the accompanying comments, comment (e) under clause (b), states the rule that, "In the case of permanent injuries or injuries causing death, it is necessary, in order to ascertain damages, to determine the expectancy of the injured person's life at the time of the tort." Significantly, this comment appears under clause (b) and therefore applies to future economic damages of lost earning capacity as opposed to future noneconomic damages of pain and suffering.[13] Cases cited under this comment

---

**13.** Neither party objected to the jury charge as it pertained to pain and suffering damages. With respect to future pain and suffering, the jury charge and the special verdict included recovery for McKeown's inability to engage in the pleasures of life. Reference in this opinion to pain and suffering damages therefore necessarily includes damages for loss of enjoyment in life.

In admiralty, as elsewhere, awards "for loss of life's pleasures is closely related to the awards for pain and suffering in that evidence offered to support a claim for loss of life's pleasures generally parallels that required to support a claim for pain and suffering." *United States Steel Corporation v. Lamp,* 436 F.2d 1256, 1267 (6th Cir.1970) (further noting that awards in category of loss of life's pleasures are made to claimants who, by reason of their injury, cannot participate in "normal activities, social, athletic or recreational"), *cert. denied,* 402 U.S. 987, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971); *see generally Thier v. Lykes Brothers, Inc.,* 900 F.Supp. 864, 879 (S.D.Tex. 1995) (Jones Act seaman entitled to damages for "physical pain and suffering including physical disability, impairment, inconvenience, the effects of [p]laintiff's injuries on the normal pursuits and pleasures of life, and mental anguish, both past and future").

The relevant portion of the jury charge is as follows:

In determining the amount of damages you may consider and award the plaintiff moneys that will fairly and reasonably compensate him

confirm that the principle applies to future economic damages of lost earnings or earning capacity.

In its Rule 50(a) supplemental memorandum, Woods Hole relied on several Connecticut cases and one New York case. All of these cases applied state law and did not involve a Jones Act or FELA plaintiff. A number of the cases are also distinguishable inasmuch as they involved future loss of earnings. *See, e.g., McManus v. Jarvis,* 128 Conn. 707, 22 A.2d 857, 860 (1939); *Sims v. Smith,* 115 Conn. 279, 161 A. 239, 241 (1932); *Jackiewicz v. United Illuminating Company,* 106 Conn. 302, 138 A. 147, 150 (1927). Moreover, other cases applying state law and not involving the Jones Act or the FELA do not require mortality tables or expert opinions to support a damages award for future pain and suffering. *See, e.g., Tabor v. Miller,* 389 F.2d 645, 647 (3rd Cir.) (noting absence of evidence such as mortality tables and expert testimony regarding life expectancy and finding "[e]nough evidence was introduced concerning the present and past state of plaintiff's health to allow the jury to act on this necessarily speculative question"), *cert. denied,* 391 U.S. 915, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968).

In opposition, however, McKeown fails to cite to any legal authority for the principle that a Jones Act plaintiff suffering permanent injuries does not need to provide evidence of his life expectancy in order receive damages for future pain and suffering. McKeown also correctly acknowledges that he did not offer into evidence either mortality or life expectancy tables. He does, however, cite to the testimony of Dr. Jackson that, except for the accident, McKeown would have been able to perform his job until the age of 65.

 In general, as noted in the jury charge, in order to award damages for future pain and suffering, there must be evidence that McKeown "is reasonably certain" to experience such damages in the future.[14] Likewise, "sheer conjecture cannot be the basis of a jury finding." *Dixon v. Pennsylvania Railroad,* 378 F.2d 392, 394 (3rd Cir.1967) (affirming failure to instruct in FELA case on future earning capacity inasmuch as jury would only be able to guess as to the plaintiff's "present and future ability to climb").[15]

 It is nevertheless true that "there is no exact measurement" for damages for pain and suffering. Schumacher v. Cooper, 850 F.Supp. 438, 453 (D.S.C.1994). Moreover, in

for past and future pain and suffering, income lost in the past and future lost earning capacity.

With respect to pain and suffering, you may award the plaintiff damages which you find will compensate him reasonably for any pain, suffering or mental anguish already suffered by him caused by the injury in question and for any pain, suffering or mental anguish which you find from the evidence in the case that he is reasonably certain to suffer in the future from the same cause.

The terms physical pain and suffering include physical disability which the plaintiff has sustained as a result of the accident as well as the effect of the plaintiff's injuries on his ability to perform the normal pursuits and pleasures of life. What is included in mental anguish is any mental suffering or emotional distress as distinguished from physical pain and suffering.

In this difficult task of putting a money figure on an aspect of an injury that does not readily lend itself to evaluation in terms of money, you should try to be objective, calm and dispassionate and not to be unduly swayed by considerations of sympathy. On the other hand, you should bear in mind that, although intangible, the plaintiff is entitled to be com-

pensated in a reasonable amount for past and future pain and suffering and mental anguish which are caused by the injury in question.

With respect to pain and suffering, the special verdict form separated the damage elements into past pain and suffering, for which the jury awarded McKeown $100,000, and future pain and suffering, for which the jury similarly awarded McKeown $100,000.

14. Neither party objected to this portion of the jury charge which corresponds with the principle in tort law that "when recovery is sought for future consequences of a tort, damages are 'available only if such consequences are reasonably certain.'" *Wood v. Day,* 859 F.2d 1490, 1493 (D.C.Cir.1988) (citation omitted); *accord Wilson v. Johns–Manville Sales Corporation,* 684 F.2d 111, 119 (D.C.Cir.1982).

15. These considerations equally apply to Woods Hole's previous arguments. As previously indicated, having examined the evidence, a reasonable jury could find that future pain and suffering damages resulting from the accident are reasonably certain to occur and not based on sheer conjecture.

contrast to damages for future medical expenses, "on pain and suffering, courts readily tolerate estimates by the jury based on a description of the injury." *Mejias–Quiros v. Maxxam Property Corporation,* 108 F.3d 425, 428 (1st Cir.1997) (citing *McCormick on Damages* § 88 at 318 (1935) and *Williams v. Missouri Pacific Railroad Company,* 11 F.3d 132, 135 (10th Cir.1993), an FELA case).

The majority of FELA and Jones Act cases which discuss the importance and need for evidence, through tables, expert testimony or otherwise, of a plaintiff's life expectancy involve a challenge to the jury's determination of damages for future loss of earning capacity. In this area, mortality tables and "expert testimony relating to the present value of any loss sustained, are competent evidence, where the injury is permanent, to assist the jury in arriving at a fair recompense for the loss of what the injured person would otherwise have earned in his trade." *Louisville & Nashville Railroad Company v. Richardson,* 285 Ala. 281, 231 So.2d 316, 317 (1970) (FELA case); *accord Hallada v. Great Northern Railway,* 244 Minn. 81, 69 N.W.2d 673, 685 (discussing significance of mortality tables for calculating future earning capacity in the case of a permanent injury in FELA case), *cert. denied,* 350 U.S. 874, 76 S.Ct. 119, 100 L.Ed. 773 (1955), *overruled on other grounds,* 262 N.W.2d 377 (Minn.1977). The tables themselves are not binding on the jury nor is their absence automatically fatal to a claim

for future loss of earning capacity.[16] *See, e.g., Goldston Corporation v. Hernandez,* 714 S.W.2d 350, 352 (Tex.App.1986) (Jones Act case). In the case of permanent injuries, it is nevertheless "necessary, in order to ascertain the damages for impaired earning capacity, to determine the life expectancy of the individual at the time of the tort." *Hallada v. Great Northern Railway,* 69 N.W.2d at 685.

Rules devised for measuring pecuniary losses for future loss of earning power, however, do not necessarily fit or apply when measuring nonpecuniary losses for pain and suffering. *See McCormick on Damages* § 88 at 318 (1935). Life expectancy tables or other evidence of the expected duration of McKeown's life are nevertheless relevant to a determination of future pain and suffering and, as previously stated, this court is troubled by the absence of such evidence in the record. To state the obvious, a plaintiff who is 25 years old and experiences the same injuries as a plaintiff who is 65 years old will likely incur a greater duration of pain and suffering in the future than the 65 year old plaintiff due to the 25 year old plaintiff's greater life expectancy.

■ Turning to the evidence in the case at bar, Dr. Jackson testified, based on her treatment of McKeown and the hypothetical job description of an oiler, that it was more likely than not that, but for the accident, McKeown would have been able to perform his job until the age of 65.[17] Based on her

**16.** The majority of courts also do not require evidence, whether by expert testimony and/or annuity tables, suggesting to the jury a method to reduce future loss of earnings to its present value. *Bonura v. Sea Land Service, Inc.,* 505 F.2d 665, 668–669 (5th Cir.1974) ("Third Circuit seems to stand alone in making either expert, actuarial evidence concerning the present value of future loss or mathematical guidance ... [a] prerequisite to the submission of loss of future wages to the jury"); *accord Worden v. Consolidated Rail Corporation,* 689 F.Supp. 35, 37–38 (D.Mass.1988) (rejecting argument that the plaintiff failed to come forward with expert or other evidence of calculating reduction of future earning capacity to present value in FELA case); *see also Heater v. Chesapeake and Ohio Railway Company,* 497 F.2d 1243, 1249–1250 (7th Cir.), *cert. denied,* 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 287 (1974); *Groves v. Illinois Central Gulf Railroad Company,* 563 So.2d 496, 501–502 (La.

App.), *writ denied,* 568 So.2d 1083 (La.1990). As noted by one court:

> standard annuity tables, expert evidence as to earning power of money safely invested, and like testimony would be admissible. No case, however, has been cited to us from the federal or state courts which has held that such proof is essential.

*Pennsylvania Railroad Company v. McKinley,* 288 F.2d 262, 265 (6th Cir.1961) (decided prior to *Ballantine v. Central Railroad of New Jersey,* 460 F.2d 540 (3rd Cir.), *cert. denied,* 409 U.S. 879, 93 S.Ct. 133, 34 L.Ed.2d 133 (1972)).

**17.** Woods Hole did not object to this portion of Dr. Jackson's testimony at trial. In addition, Woods Hole did not file a motion for leave to file a supplemental supporting memorandum to argue that the jury cannot consider this testimony for purposes of inferring that McKeown will live at least to the age of 65.

experience and over Woods Hole's objection, Dr. Jackson additionally stated that McKeown will probably experience or maintain the same level of discomfort one year from now, i.e., March 28, 1999.

Even without Dr. Jackson's testimony as to McKeown's work life expectancy, however, sufficient evidence exists to support the jury's verdict. First, Dr. Jackson's testimony detailed supra provides evidence from which a reasonable jury could conclude that McKeown's injuries were permanent and that he would experience chronic pain. Second, the previously summarized testimony of McKeown, born in January 1937 and therefore 61 years old at the time of trial, provides support for the jury's verdict.

Unlike pecuniary damages, non-economic damages may be largely supportable on testimony from a plaintiff concerning his pain and suffering and loss of enjoyment of life after an accident together with evidence that the injuries are permanent and chronic.[18] *See, e.g., Havinga v. Crowley Towing and Transportation Company*, 24 F.3d 1480, 1487–1488 (1st Cir.1994) (affirming lower court's denial of Rule 50(b) motion in admiralty action and upholding damages award for pain and suffering without mentioning the plaintiffs' ages or life expectancies); *Rogers v. Elgni, Joliet & Eastern Railway Company*, 248 F.2d 710, 712 (7th Cir.1957) (instruction for jury to consider future pain and suffering sufficient notwithstanding allegation of lack of proof where the plaintiff testified about his limited range of motion and pain and expert testified about permanent limitation in range of motion); *Goldston Corporation v. Hernandez*, 714 S.W.2d 350, 353 (Tx.App.1986) (evidence supported award for future pain and suffering in light of the plaintiff's testimony of being depressed and embarrassed and that injury restricted his activities and made stepping painful). Consequently, while the more prudent course is to provide the jury with evidence of the expected duration of the plaintiff's life, it is not required in a Jones Act

case where, as here, there is other evidence in the record of a permanent condition and testimony concerning the nature of present pain and suffering. In short, the evidence in the case *sub judice* is sufficient to support the jury's verdict awarding damages for future pain and suffering notwithstanding Woods Hole's assertion of the absence of evidence as to the duration of McKeown's life.

### CONCLUSION

In accordance with the foregoing discussion, McKeown's motions for a new trial and for judgment as a matter of law (Docket Entrye68 & 66) are **DENIED**. Woods Hole's motion for judgment as a matter of law (Docket Entry # 64) is also **DENIED**. An amended final judgment shall enter to reflect the jury finding of contributory negligence. Post-judgment interest shall accrue from the date of the original judgment, February 2, 1998. *See Cordero v. De Jesus–Mendez*, 922 F.2d 11, 16 (1st Cir.1990).

---

**18.** Specifically, in *Havinga* the First Circuit stated that, "the noneconomic damages are largely supportable simply on the uncontroverted trial evidence that each plaintiff had already experienced substantial deficits in emotional function and loss of enjoyment of life which could be expected to continue *into the indefinite future* [emphasis added]." *Havinga v. Crowley Towing and Transportation Company*, 24 F.3d at 1487.